1
2
3
4                          UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6                                 SAN JOSE DIVISION
7

8      JOHN DAVIS,                              Case No.   19-cv-00444-EJD

                     Petitioner,
9                                               **ORDER DENYING PETITION FOR
                                                WRIT OF HABEAS CORPUS**
10            v.

11     DEBBIE ASUNCION,                          Re: ECF No. 17

                     Respondent.
12

13

14          John Davis ("Davis"), presently incarcerated at the California State Prison, filed a petition

15   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his state court conviction.

16   Petition for Writ of Habeas Corpus.  ECF No. 1.  Davis subsequently filed an Amended Petition,

17   ECF No. 8, and the operative Second Amended Petition ("Petition" or "Pet."), ECF No. 17.  The

18   Court then issued an Order to Show Cause to Respondent.  ECF No. 18.  Respondent answered the

19   order to show cause, ECF Nos. 26, 26-1 ("Answer"), and Davis filed a Traverse, ECF No. 31.

20   Having considered the parties' papers, the record in this case, and the relevant legal authority, the

21   Court **DENIES** Davis's Petition for the reasons discussed below.

22   **I.      BACKGROUND**

23          The following facts are taken from the opinion of the state appellate court:

24                 This case arises from the 1985 stabbing death of 28–year–old Barbara
                   Martz.  In 2002, appellant's DNA profile was found to match the DNA
25                 profile of semen found in Martz's body after her death.  The trial from
                   which this appeal is taken took place in 2016.  The prosecution theory
26                 at trial was that appellant, who lived nearby and was 18 years old at
                   the time of Martz's death, had raped and murdered Martz in her home
27                 before fleeing with her purse and wallet.  The defense theory was that

28   Case No.: 19-cv-00444-EJD
     ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS
                                        1

*United States District Court*
*Northern District of California*

appellant and Martz had engaged in consensual sexual intercourse in the day or two before the murder and that Martz's boyfriend Bobby Adams or another person had subsequently murdered her and taken her belongings.

***Prosecution Case***

Ira Schrank testified that he met the victim, Barbara Martz, in 1974 when they were both students at Goddard College in Vermont. He also met Bobby Adams at Goddard College, and he, Martz, and Adams remained very good friends over the years. They were all photographers and in 1981, they started a business together in San Francisco operating a commercial lab, while also pursuing their own art. Martz and Adams were in a romantic relationship from around 1980 through 1985. Although they broke up more than once in the year before she died, they remained close and were back in a romantic relationship at the time of her death. Schrank acknowledged that their relationship was volatile at times. He did not recall Martz dating anyone else while she and Adams were broken up.

Schrank testified that in the year before her death, Martz bought a house on Potrero Hill, where she was killed on December 4, 1985. In the months before her death, she was "moving away" from working at the business with him and Adams. One of the reasons she wanted to leave the business was because of the strain being in business together placed on her relationship with Adams. She also "wanted to go in a different direction in her career."

On the evening of Martz's death, Schrank received a phone call from Adams, who sounded very upset and said that he thought Martz was dead. Schrank immediately went to Martz's house, which was close to where he lived. When he arrived, he saw Adams pacing in the street. Schrank went through the front gate and into the house, where he saw Martz's naked body in a curled up position, with blood on her back. He then went back outside and waited with Adams for the police to arrive.

Bobby Adams testified that he had known Martz since college in Vermont. Their relationship became romantic in the late 1970s, after Adams moved to San Francisco, where Martz was now attending the Art Institute. They broke up for about a year, from 1984 to three to five months into 1985, before again resuming their relationship. They were in a romantic relationship for six years in total. After Martz stopped working regularly at their business, in the last month or two of her life, Adams saw her approximately two to five times a week. He was not aware of her dating anyone else either while they dated or during the period of their breakup.

On December 4, 1985, the day of Martz's death, Adams was working at his studio and Martz was working at another photographer's studio. They spoke on the phone early in the day about their plans for the evening. Martz had asked him to come to her house to help her start tiling her bathroom and she planned to cook dinner for him. She said she would call him when she got home, after she left work and bought

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

groceries. They had spent an enjoyable weekend together a few days before she died at Orr Hot Springs in Mendocino County. They got along well and had sexual intercourse on the Friday and Saturday. That Saturday was the last time they had sex.

On the evening of Martz's death, Adams left work and went home, where he watched the evening news. He then called Martz, but reached her answering machine; he left a message to call him when she got home. He called again between 7:30 and 8:00 p.m., but got a busy signal. He called back at least four more times, always hearing a busy signal. Sometime between 8:15 and 8:25 p.m., Adams rode his motorcycle to Martz's house on 25th Street. It would have taken him 10 minutes or less to get there.

There was always a bicycle lock on the gate in front of Martz's house; he did not recall a prior time he went to the house when the lock was not on the gate. That night, the gate was cracked open. He walked through the gate and saw that the door on the porch was wide open, which he thought was "a little weird." As he came into the house, "the TV was on but pure static." He then saw Martz on the floor. There was a great deal of blood and punctures in her abdomen and neck. Blood had also pooled underneath her body. She was naked; he saw her clothing on the floor. When he saw her eyes, which were open and "completely glazed," he was pretty sure she was dead, but he touched her arm and she still felt warm. He saw that her phone was off the hook. He re-cradled it to get a dial tone, then called 911. After he called 911 and Schrank, Adams kissed Martz and said, "I love you Barb." He was saying goodbye to her. He "was completely out of [his] head" after finding her body. He "was so confused by the whole thing, about the whole thing. It felt like going into a very black dream."

When Adams called Schrank, he told Schrank that Martz was dead. He then went to the house next door and yelled up to the house, asking the elderly man who lived there if he heard anything. The man said he had not. Adams then stood in front of the gate at Martz's house to wait for the ambulance and police. He did not speak to anyone else during that time period. Soon, Schrank and his friend Carl arrived. The police then arrived, about 10 to 15 minutes after he called 911.

On cross-examination, Adams testified that one reason Martz decided to leave the business she operated with him and Schrank was because of the pressure of being in both a business and a romantic relationship with him. They argued a great deal in the period before they split up, which was why they stopped going out together. The arguments were normally verbal, but Martz struck him a couple of times and he slapped her once. That was the only time he ever touched her in anger. Once they got back together, the arguments did not resume. Martz pulled out of the business as a way to solve the pressure they both felt about being in both a business relationship and a romantic relationship.

Also on cross-examination, Adams testified that he did not recall police closely inspecting his clothing or shoes, or asking to take

samples of his fingernails on the night of Martz's death. He went with officers to the police department that night, but did not know if police searched the bag he had with him or his motorcycle. Police did not ask for permission to search his home. On redirect examination, Adams identified a letter he had written to then Mayor Dianne Feinstein asking for a reward to be posted for solving this crime. He also sent a postcard to two homicide officers a week or two after Martz's death, giving them his family's address where he would be staying over Christmas, "[b]ecause I wanted to be in the loop if anything came up."

Melinda Lowe testified that she and Martz became roommates in 1983. In the summer of 1985, she moved with Martz to the house on 25th Street that Martz had purchased. In early December 1985, they had been leaving the gate in front of the house unlocked so construction workers who were working on the house could get in. On the night of December 4, Lowe left work around 5:45 p.m., and went home to change her clothes before leaving around 6:30 p.m. to go to a cocktail party. No one else was in the house while she was there. She did not remember if she locked the door to the house when she left for the party. She closed the front gate, but did not lock it because she was in a hurry. After Martz's death, the only thing Lowe noticed missing from the house was a kitchen knife.

Edward Erdelatz testified that in 1985, he was working for the San Francisco Police Department as a homicide inspector. Around 9:00 p.m. on December 4, 1985, he went to Martz's house. He met Adams at the scene, and recalled "his demeanor being typical of somebody who has experienced or witnessed a traumatic event or the aftermath of a tragic event." When he entered the house, Erdelatz saw Martz, who was nude and lying on the floor of the main room. He saw numerous knife wounds on her body. There was a great deal of blood and there were clothes strewn about. A broken strap from a purse was nearby. Erdelatz also saw blood on the walls in the living room. In the kitchen, there was a grocery bag and a receipt from Rainbow Grocery that was dated December 4, 1985. He also saw a knife rack in the kitchen that appeared to be missing a knife. A knife was found a short time later outside the house. There was no evidence of a forced entry into the house.

Initially, Erdelatz considered the possibility that Adams could have been responsible for Martz's death. However, Adams was never arrested because police "determined he had nothing to do with her death."

On cross-examination, Erdelatz testified that the fact of a bloody shower curtain subsequently being found in the basement of Martz's house was "vaguely familiar," but he could not recall any details.

James White, who was 16 or 17 years old in 1986, testified that on July 28 of that year, he was living in the Potrero Hills housing project on 25th Street in San Francisco. That day, his brother, nephew, and cousin had gone into a maintenance room underneath the building to play. He went into the room to get them to leave because it was not

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS
4

a safe area. While there, White saw three or four credit cards with the name Barbara Martz on them. White took the cards to the mayor's office, where he was an intern; gave them to one of the mayor's protection detail officers; and asked him to return them to their owner. White subsequently took police officers to the place he found the credit cards, where he saw more credit cards when an officer shined his flashlight into the area.

At trial, White identified appellant as someone he remembered from the neighborhood 30 years earlier.

Retired San Francisco Police Officer Jeffrey Brosch testified that White showed him the basement area where he found the credit cards. In the same area, police located other cards, a purse, and a wallet.

Dr. Amy Hart, a medical examiner for the City and County of San Francisco, testified as an expert in forensic pathology. Dr. Hart did not perform the autopsy on Martz, but reviewed the records of Dr. Duazo, who performed the autopsy at noon on December 5, 1985, approximately 18 hours after Martz's death. The body was received at 11:05 p.m. on December 4, and was likely refrigerated until the autopsy took place.

The autopsy report showed that Martz had suffered seven "sharp force injuries," including a stab wound to the front of her neck that perforated the larynx and a vertebra, entering the spinal column. The depth of that stab wound was four and a quarter inches. A stab wound to Martz's lower left chest traveled four and a half inches through her ribs, perforating her diaphragm, liver, and pancreas before perforating the aorta, which caused rapid blood loss, and terminated in a vertebra in her lower spine. Another stab wound was located just below the other stab wound to the chest, but went from right to left through the body. That stab wound traveled through part of the diaphragm, then went into and out of the stomach and again perforated the diaphragm. That wound, which terminated in soft tissue near a vertebra in her middle back, measured five and a half inches in depth. There were four incise or cut wounds located on the front of Martz's neck, which were made by slicing motions to the neck. Finally, the autopsy report noted a total of five blunt force injuries on Martz's arms, legs, and head. Martz died from multiple sharp force injuries, which caused her to bleed to death.

Dr. Hart testified that Dr. Duazo took vaginal swabs from Martz during the autopsy, which Duazo examined under a microscope as a smear on a glass slide. Dr. Duazo saw spermatozoa, most of which had no tails.

Dr. Hart further testified that the large concentration of sperm found in Martz's vaginal area was an indication that the sperm deposits were obtained relatively close in time to ejaculation. In a live female who has sexual intercourse, sperm would be expelled "by the normal secretions that are formed within the vaginal canal in general, and they can be expelled by gravity, and they can be expelled by another mechanical force such as washing of the vaginal canal." In addition,

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

5

the processes inside the vagina that help degrade sperm do not stop working immediately after death, though death would slow the process of degradation and that process would eventually cease. Refrigeration of the body "may" slow the degradation process of any sperm in the vaginal cavity. After sperm are deposited in a female's vagina, they would normally initially be intact. Then, with the passage of time, the sperm would begin to degrade and the heads and tails of the sperm would separate.

Referring to a study called Forensic Laboratory Evaluation of Evidence in Alleged Rape by Michael R. Soules (Denver study), Dr. Hart testified that that study involved 10 couples in which sperm deposited into females' vaginas during intercourse was removed and examined at certain intervals to analyze the morphology—i.e., the size and shape—of the sperm over time to learn whether the rate at which sperm degrade could assist in determining the time when sperm were deposited. In the study, 100 percent of female subjects had whole sperm present up to 18 hours after intercourse. Dr. Hart noted, however, that the study was designed so that, as long as there was at least one intact sperm with a head and a tail, that would be considered a positive result. Up to 48 hours after intercourse, 50 percent of female subjects had present at least one intact sperm with a head and a tail. Finally, at 72 hours, 25 to 50 percent of subjects still had present at least one intact sperm with a head and a tail.

Dr. Hart agreed with the statement that "under different circumstances and in different females with different factors involved, sperm may degrade more or less in different situations." Dr. Hart also responded in the affirmative to the following hypothetical question: assuming that sperm taken from a deceased female's vagina were examined under a microscope at noon and most of them had no tails, "is it possible that the sperm found within the female could have been deposited at approximately 7 p.m. or roughly 17 hours before you're looking at them under a microscope?" Such a finding was consistent with the Denver study and other scientific literature Dr. Hart had read.

On cross-examination, Dr. Hart testified, with respect to the previous hypothetical, that sexual intercourse could also have occurred 24 to 48 hours before the autopsy.

Dr. Cydne Holt, a criminalist at the San Francisco Police Department crime lab from 2002 to 2009, testified as an expert in DNA analysis and comparison and in cell and molecular biology. In 2002, San Francisco received a state grant to investigate crimes that had been committed in the 1980's, using modern DNA technology. Also in 2002, Holt was assigned to analyze DNA obtained from several samples taken from Martz's body during her autopsy. Dr. Holt was able to detect sperm cells in various vaginal samples, which she used to develop a full DNA profile of the person who deposited the sperm. Dr. Holt noted that several of the vaginal samples contained a high concentration of sperm, which generally indicates that the sperm deposit was collected relatively close in time to ejaculation.

Dr. Holt also answered questions about the Denver study, and testified

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

that 17 hours after sexual intercourse, it was possible that most of the sperm in a sample would be missing their tails.  Sperm in a female's vagina will continue to degrade after death and during refrigeration of the body, even if it slowed down. In addition, different sperm will degrade at different speeds.

On cross-examination, defense counsel asked a hypothetical question involving the donor of sperm found in a deceased female, where most of the sperm were missing tails approximately 17 hours after death. If the sperm donor had subsequently ejaculated into a specimen cup and all the sperm were found to be intact and motile after five hours, Dr. Holt opined that such findings were not inconsistent with a sperm deposit close to the time of death.  This was because "the rate of loss of motility and the loss of tails when ejaculate is in the body orifice is different than ... when it is in a specimen cup."  Dr. Holt described the comparison of the two semen samples as "apples to orange[s]."

Dr. Bonnie Cheng, a criminalist with the San Francisco Police Department crime lab from 1999 to 2008, testified as an expert in DNA analysis and comparison.  In October 2002, she was assigned to work on Martz's case.  In October 2005, she used an oral reference swab obtained from appellant in November 2002, to develop a DNA profile.  That DNA profile matched the DNA profile of the semen recovered from Martz's body after her death.  Appellant was the sole source of DNA in the semen sample.

David Jackson, the crime lab DNA supervisor, testified as an expert in DNA analysis and DNA statistical analysis.  Jackson testified that the probability of selecting another individual who had the same DNA profile as appellant was 1 in 9.94 quintillion for the Caucasian population, 1 in 18.7 quadrillion for the African–American population, 1 in 228 quintillion for the Hispanic population, and 1 in 110 quintillion for the Asian population.

San Francisco Police Officer James Spillane testified that he was assigned to Martz's case in January 2002.  During his investigation, he interviewed Martz's boyfriend, Bobby Adams, who never showed any reluctance to talk to him.  Spillane eventually eliminated Adams as a suspect.  He also interviewed Melinda Lowe, Ira Schrank, Carl Duncan, James White and others.

On December 2, 2002, based on information he received in this case, Spillane interviewed appellant.  The audio recording of that interview was played for the jurors, who were also given a transcript of the recording.  At the start of the interview, appellant waived his Fifth Amendment rights and agreed to speak with Spillane.

In the interview, appellant confirmed that he grew up on 25th Street on Potrero Hill in San Francisco.  Appellant recalled there was an area underneath the building in which he lived where he used to make forts.  Spillane showed appellant photographs of Martz's purse and wallet, explaining that they had been found in that area under the building where appellant grew up.  Appellant initially denied having seen either item, but then said, "this wallet is kind of familiar though."

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

United States District Court
Northern District of California

7

When asked if he could have handled the purse or wallet, appellant said, "Oh I don't think so," and then affirmed that he did not remember. He also said it was "possible" that he had seen the wallet and picked it up. When shown a photograph of Martz's house, appellant said he recognized it and knew its location on 25th Street. When asked if he had ever burglarized that house, appellant initially said no, but then said, "I'm pretty sure I haven't." He affirmed that he thought he would remember if he had burglarized the house.

Spillane next showed appellant several photographs of Martz. When asked if he had ever seen that woman before, appellant said no. When asked if he had had any contact with her in the neighborhood, appellant said, "No. I don't—not no white woman, no. Not on the Hill." When asked if he would remember her if he had ever seen her or had contact with her, appellant said, "Oh yeah." After discussing the photos, Spillane asked, "Are you all right John?" and appellant said, "Oh yeah."

Appellant told Spillane that in 1985 and 1986, he was sexually active with a girl named Monica, but that he was not sexually active with anyone else at that time, stating, "I would remember." At that point, appellant asked, "What is this all about?" Spillane responded that the woman who lived in the house on 25th Street in 1985 was raped and murdered, and that the semen from the rapist was DNA tested and found to be a match with appellant. Appellant responded, "Oh hell no." When told this was his chance to tell his side of the story, appellant said, "I don't have a side of the story." He then said he had never raped anybody; it was not in his character. When Spillane said his semen had been found, appellant said, "Then you better go to court then cause I don't remember raping nobody." He then said, "I have never raped anybody," and the interview ended.

Spillane testified at trial that in 1985, appellant's home was 400 to 500 feet away from Martz's home. During the course of his investigation, Spillane never received any evidence about a "potential consensual sexual encounter" between appellant and Martz.

Richard Fuchs testified about a crime appellant committed against him on April 3, 1988, when Fuchs was living on Potrero Hill in San Francisco. Around 8:00 or 8:30 that evening, Fuchs went downstairs to do some work, carrying a teapot in his right hand. As he entered his dimly lit office, Fuchs saw some movement in the shadows. Fuchs shouted loudly, waved the teapot as if it were a weapon, and told the person he thought he saw near his desk to get down on the floor. The person got down on the floor, but then apparently saw that Fuchs was waving a teapot, not a gun, and got up. The person then approached Fuchs and said he wanted money. Fuchs's wife, who had heard Fuchs shouting, came in waving a broom. At that point, the person took a hatchet out of his hoodie and used it to smash the teapot in Fuchs's hand, from about three feet away. The blade of the hatchet came within two or three inches of Fuchs's hand. The swinging of the hatchet took Fuchs by surprise, but he was not really scared: "The man was not that menacing. He seemed high ... I suppose I should have been scared with the hatchet. I didn't believe he was capable of

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

actually hitting me with that."

After swinging the hatchet, the person said, "give me all your money; I'm desperate." Since the money was upstairs, Fuchs, his wife, and the person went upstairs and Fuchs gave him $200 to $300 that was in a little wooden box in the living room. As the person headed for the front door, past the bedrooms in which their two sons were sleeping, Fuchs's wife said, " 'Please don't harm the children.' " After the person left, Fuchs called the police. There was no sign of forced entry into the home.

The parties stipulated that the person who entered Fuchs's house and swung the hatchet was appellant and that in 1988, he pleaded guilty to residential robbery at the Fuchs's home and was sentenced to serve a term in state prison.

***Defense Case***

The defense recalled Bobby Adams, who testified that he believed he and Martz had intercourse on both the Friday and Saturday before she died, while away on a weekend trip. Defense counsel read a stipulation that Adams had told police during an interview the day after the murder that they had last had sex on the Friday before her death and that he had not ejaculated inside her because she had taken no birth control precautions.

Brenda Beebe testified that she and Martz were neighbors on 25th Street; they lived two houses apart. They became casual friends a few months before she died and did yoga together occasionally. Beebe also knew Martz's boyfriend Bobby in passing. Within a couple of months before trial, Beebe was interviewed by Officer Spillane.

Beebe testified that at some point on the day or night Martz died, Bobby Adams came to her house, though she had "no idea" when he came over in relation to when the police vehicles and the coroner arrived. She may have told Spillane it was an hour before, but she stated that "it's very foggy for me. Pressed for an answer, I may have said that, but I absolutely don't know for sure. It was before." When asked if it was dark outside when Adams arrived, Beebe continued, "At first, I said it was the afternoon, that it was bright sun, and there was no weather. Then—that's without any details of fact. Then I was subsequently told that it was dark; it was raining. So that's all foggy. I can't be held to that."

Beebe further testified that when Adams arrived at her house, he asked to use the telephone. He made a phone call, but she did not hear any conversation. His demeanor was "agitated, anxious." He then left very quickly. When reminded that she had told Spillane that Adams told her, " 'I can't get into the house, and I don't have a key to the gate,' " she testified, "Yeah, that's probable." Beebe agreed that it was fair to say that she remembered that Adams came over on the day he did because of the coincidence that it was the same day Martz died. On cross-examination, Beebe repeated that her memory of the day of Martz's death was foggy.

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

United States District Court
Northern District of California

The defense again recalled Adams, and in response to a question by defense counsel, he testified that he was not near Martz's house earlier in the day on December 4, 1985.

Defense counsel read several stipulations to the jury, including (1) there was an entry in the police case file regarding someone named Scott Brazil, who located a curtain at Martz's house in July 1986, and there was no entry showing that the police investigators followed up on the curtain information; (2) there was no notation in the police case file that Adams's bag or bags were searched or seized by police near the time of Martz's death; (3) police never searched Adams's home; and (4) police did not speak with anyone who claimed to have seen Adams between 6:20 p.m. and 8:36 p.m. on the night of Martz's death.

Dr. Jeffrey Tice, an associate professor of medicine at the University of California, San Francisco, testified as an expert in clinical medicine and research in medical literature. Dr. Tice examined a semen sample from appellant at 1:15 p.m. on July 2, 2015, approximately one hour after it was collected in a sterile cup. He examined the sample under a microscope and observed that all of the sperm he could see were intact and actively moving. He examined the sperm again at 4:20 p.m., and they remained intact and vigorously moving. He examined the sample again at 6:15 p.m. The sperm were all intact and they were still moving, but less vigorously. He observed no congenital defect in the sperm that would keep them from having tails.

Dr. Nenita Duazo, the pathologist who performed the autopsy on Martz's body in 1985, testified as an expert in the performance of autopsies. When she examined the sperm taken from Martz's vagina under a microscope, she saw no tails on them. On cross-examination, she testified that a notation in her report regarding the sperm she observed under the microscope described what she saw as "spermatozoa most of which have no tails." She testified that the notation meant "maybe 99 percent or more without tails. Maybe I saw, maybe one, that's what it means. It is very rare that I see anything with tail." Duazo said she saw maybe one or two sperm with tails. She later testified that she probably saw no sperm with tails, but wrote that most had no tails since she could not examine every sperm. Dr. Duazo also testified that "most of the time the tails are lost quickly" because they are more fragile and affected by drying or bacterial degradation. She also testified that she would like to examine the slide again on the question of whether any sperm had tails because "[w]hen I did the autopsy the only thing I was—is [*sic*] the presence of spermatozoa which is to say there was evidence of intercourse."

*People v. Davis*, No. A147593, 2018 WL 2977267, at *1–8 (Cal. Ct. App. June 14, 2018)

(unpublished) (footnotes omitted).  In 2003, Davis was charged with murder, with two special

circumstances: murder in the course of a rape and murder in the course of a burglary. *Id.* at *1.  In

2016, a jury found Davis guilty of first-degree murder and found true both special circumstance

allegations, and the trial court sentenced Davis to life in prison without the possibility of parole.

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

1   *Id.* Davis appealed, and the California Court of Appeal affirmed the judgment. *Id.*; Pet. at 75–

2   100; ECF No. 28-6.  The Court of Appeal denied Davis's petition for rehearing on July 11, 2018.

3   Pet. at 10.  On September 19, 2018, the California Supreme Court denied Davis's petition for

4   review.  *Id.*; Answer at 2; ECF No. 28-8.

5   Davis now raises the following grounds for habeas relief: (1) denial of due process because

6   the trial court admitted evidence that Davis had previously committed burglary and swung a

7   hatchet[1] during the incident ("Claim 1"); (2) denial of due process because the trial court did not

8   sanitize the evidence of the prior burglary by excluding testimony related to Davis's use of the

9   hatchet ("Claim 2"); and (3) denial of due process because the trial court improperly instructed the

10  jury regarding the use of the prior burglary and hatchet evidence ("Claim 3").  Pet. at 12–15.

## II.     LEGAL STANDARD

12  "[A] district court shall entertain an application for a writ of habeas corpus in behalf of a

13  person in custody pursuant to the judgment of a State court only on the ground that he is in

14  custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

15  2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-

16  132, § 104, 110 Stat 1214, imposes additional restrictions on habeas review.  A petition for habeas

17  relief may not be granted unless the state court's adjudication on the merits of a claim: "(1)

18  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

19  established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

20  in a decision that was based on an unreasonable determination of the facts in light of the evidence

21  presented in the State court proceeding."  28 U.S.C. § 2254(d).  Davis does not contend that the

22  California Court of Appeal's decision "was based on an unreasonable determination of the facts."

23  *See* Pet.

24  "A state court's decision is 'contrary to' [the Supreme Court's] clearly established law if it

25

26  _____

27  [1] Although the parties describe the object used during the burglary as an axe, *see, e.g.*, Pet. at 13; Answer at 1, the witness who provided the testimony regarding the object described it consistently as a hatchet.  12 RT 1263–74.  The Court therefore refers to the implement as a hatchet.

28

1   'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it

2   'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

3   Court and nevertheless arrives at a result different from [the] precedent.'" *Mitchell v. Esparza*,

4   540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13

5   (2000)).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

6   the state court identifies the correct governing legal principle from [the Supreme] Court's

7   decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*,

8   529 U.S. at 413.  "[A]n *unreasonable* application of federal law is different from an *incorrect*

9   application of federal law." *Id*. at 410.  Thus, "a federal habeas court may not issue the writ

10  simply because it concludes in its independent judgment that the relevant state-court decision

11  applied clearly established federal law erroneously or incorrectly.  Rather, that application must

12  also be unreasonable." *Id*. at 411.

13      In determining whether a state court decision is either "contrary to" or an "unreasonable

14  application" of federal law, federal courts look to the state court's last reasoned decision. *Kennedy*

15  *v. Lockyer,* 379 F.3d 1041, 1052 (9th Cir. 2004), *cert. denied,* 544 U.S. 992 (2005).  Because the

16  California Supreme Court denied Davis's petition for review without comment, the last reasoned

17  state court decision is that of the California Court of Appeal. *Ylst v. Nunnemaker*, 501 U.S. 797,

18  803 (1991) ("[F]or federal habeas purposes, … [w]here there has been one reasoned state

19  judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting

20  the same claim [are presumed to] rest upon the same ground.").  This Court therefore reviews

21  herein the California Court of Appeal's decision. *Id*.; *see also Brodit v. Cambra*, 350 F.3d 985,

22  987 (9th Cir. 2003), *cert. denied*, 542 U.S. 925 (2004) ("Under AEDPA, we 'look through'

23  unexplained decisions to the last reasoned state-court decision.") (citation omitted).

24  **III.    DISCUSSION**

25      **A.    Claims 1 and 2**

26      Davis contends that his right to due process under the Fourteenth Amendment was violated

27  by the admission of evidence that Davis had (1) previously committed burglary and (2) swung a

28  Case No.: 19-cv-00444-EJD
    ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

United States District Court
Northern District of California

1  hatchet during the incident.  Pet. at 43–44, 56.  He argues that the evidence was irrelevant and,

2  even if relevant, the probative value of the evidence was so greatly outweighed by the prejudicial

3  impact as to deny him a fair trial and violate due process.  *Id.* at 46–47, 51–52, 63.  The California

4  Court of Appeal combined its analysis of the admission of the burglary and hatchet evidence.

5  *Davis*, 2018 WL 2977267, at *10–11; ECF No. 28-6 at 15–20.

### 1.    Procedural Background

7  The Court of Appeal's discussion of the admission of the burglary and hatchet evidence

8  focused on the harmlessness of the evidence, even if improperly admitted under state law:

> Here, we need not definitively decide whether the court acted within its discretion when it admitted the prior offense evidence and refused to at least sanitize it to remove reference to appellant's use of a hatchet.  (See [Cal. Evid. Code] §§ 1101, subd. (b) & 352.)  That is because we have concluded that any error in its admission did not prejudice appellant.  (See *People v. Watson* (1956) 46 Cal. 2d 818, 836 (*Watson* ).)

> First, Fuchs's testimony was brief, taking up only 11 pages of reporter's transcript in the context of a lengthy trial.  Second, although Fuchs testified that appellant swung a hatchet at the teapot he was holding, Fuchs also testified that he was not scared of appellant, whom Fuchs did not find menacing and did not believe was capable of actually hitting him.  Thus, evidence of the encounter between appellant and Fuchs was not inflammatory in comparison to the vicious rape and murder of Martz alleged in this case.  (See *People v. Sullivan*[ (2007)] 151 Cal. App. 4th 524, 559; § 352.)

> In addition, the evidence of appellant's guilt was extremely strong.  DNA evidence established with near certainty that appellant's semen, and no one else's, was inside Martz's vagina after her death.  Appellant lived within 400 to 500 feet of Martz's home, where she was murdered.  In his 2002 interview with Spillane, appellant said he recognized a photograph of Martz's house and knew where it was located on 25th Street.  Moreover, Martz's missing purse and wallet were subsequently found in a maintenance area of the building where appellant lived.  He told Spillane that he had made forts in the maintenance area where her possessions were found and acknowledged that her wallet looked "kind of familiar." Although he "d[id]n't think" he had handled the wallet, it was "possible" that he had seen it and picked it up.  Regarding whether he had ever burglarized Martz's house, appellant initially said no, but then said, "I'm pretty sure I haven't."

> Spillane testified that when he showed appellant photographs of Martz, appellant "seemed to become rather withdrawn," although he denied having ever seen Martz, affirming that he would remember if

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS
13

he had come in contact with her. Appellant also said he was sexually active with only one person in 1985, a girl named Monica. Finally, after Spillane told appellant that Martz had been raped and murdered, and that appellant's semen matched that of the rapist, appellant said they would have to go to court because "I don't remember raping nobody."

The defense theory—that appellant had had consensual sexual intercourse with Martz a day or two before her murder—was incredible in several ways. First, as noted, appellant told Spillane he had never seen Martz before and was sexually active only with a girl named Monica in 1985. Nor was there evidence from any source remotely suggesting a possible consensual sexual encounter between appellant and Martz. That theory was also incredible in light of the medical evidence that a large amount of semen was found in Martz's vaginal area during the autopsy, which, according to both Dr. Hart and Dr. Holt, indicated that the sperm deposit was collected relatively close in time to ejaculation. As Dr. Hart testified, if sexual intercourse had taken place 12 to 48 hours before Martz's death, the semen would likely have been wiped away when Martz used the bathroom, washed off when she took a shower, or rubbed off onto her underwear.

The defense's reliance on the Denver study to support the theory that appellant's sperm must have been deposited significantly prior to Martz's death in light of the large number of tailless sperm seen during the autopsy, was also unpersuasive, considering the relevant testimony presented at trial. First, both Dr. Hart and Dr. Holt testified that sperm continue to degrade for a period of time in a deceased person's body and during refrigeration, though perhaps at a slower rate. Both doctors also testified that the findings of the Denver study—that all 10 female subjects had intact sperm present 18 hours after intercourse— required the presence of only one intact sperm to be considered a positive result. Dr. Duazo's autopsy report had described what she observed under the microscope as "spermatozoa most of which have no tails." When testifying at trial Dr. Duazo acknowledged that this notation meant that she saw perhaps one or two sperm with tails, although she later testified that it probably meant that she saw none and was just being careful. Thus, while her trial testimony was more equivocal, Dr. Duazo's autopsy findings were *not* inconsistent with the Denver study, and the fact that most of the sperm taken from Martz's body were missing tails did not prove, as appellant argues, that intercourse had taken place many hours before her death.

Moreover, the evidence presented in support of the defense's attempt to implicate Adams in Martz's murder was extremely weak. The fact that Martz and Adams had broken up for a time after a difficult phase in their relationship did not supply evidence that Adams had murdered Martz. Indeed, the evidence showed that they had reconciled and their relationship had improved since Martz became less involved in their business. Contrary to the defense's claim that the police had never considered Adams a possible suspect, Erdelatz testified that police had determined that Adams had nothing to do with the murder

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and Spillane testified that he had interviewed Adams during the investigation, but had eventually eliminated him as a suspect.

Finally, appellant argues that Martz's neighbor, Brenda Beebe, contradicted Adams's testimony that Martz's gate was unlocked when he arrived on the night of her death and notes that he failed to testify to any encounter that night with Beebe. Beebe's testimony that Adams had come to her house at some point on the day or night of Martz's murder before the police arrived, that he said he did not have a key to the lock at Martz's home, and that he used the telephone was all based on her admittedly "foggy" recollection of that day. Although Beebe's testimony was inconsistent with that of Adams in certain particulars, given Beebe's acknowledged difficulty remembering the details from that day and Adams's "panicky state" after finding Martz's body, it is not surprising that one or both witnesses would misremember some details from a night more than 30 years earlier. In context, these discrepancies do not, as appellant argues, point to Adams as the murderer. Nor do they alter the fact that the vast majority of the evidence presented at trial pointed solely to appellant as the person who murdered Martz in the course of a rape and a burglary.

Accordingly, considering the minimal amount of time taken up by presentation of Fuchs's testimony, the vastly more inflammatory nature of the present offense, and the exceptionally strong evidence of appellant's guilt, we conclude it is not reasonably probable that the result would have been different had the court excluded evidence of the Fuchs incident. (See *Watson*, *supra*, 46 Cal. 2d at [] 836.)

*Davis*, 2018 WL 2977267, at *10–11 (footnotes omitted); ECF No. 28-6 at 18–21 (same).

The California Court of Appeal also rejected Davis's due process arguments regarding the burglary and hatchet evidence:

Appellant also asserts that admission of the prior offense evidence violated his constitutional rights to due process and a fair trial. We have already explained that the evidence regarding the Fuchs incident was, even if improperly admitted, neither inflammatory nor likely to affect the result in this case. Hence, because admission of this evidence did not "infect[ ] the entire trial" or render it fundamentally unfair, appellant has not demonstrated a violation of his constitutional rights. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Partida* (2005) 37 Cal. 4th 428, 436; see also *People v. Lewis* (2009) 46 Cal. 4th 1255, 1289 [noting, with respect to defendant's claim of constitutional error in admission of propensity evidence under section 1101, subdivision (b), "that '[t]he "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights" ' "].)

*Id.* at *11 n.10.

United States District Court
Northern District of California

## 2.     Legal Analysis

Davis argues that his Fourteenth Amendment due process rights were violated when the trial court allowed the state to present evidence that Davis had committed a prior burglary, during which he swung a hatchet. Pet. at 53–54, 63–64. For an allegedly wrongful admission of evidence to violate due process, the evidence must be "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)); *see Larson v. Palmateer*, 515 F.3d 1057, 1065–66 (9th Cir. 2008) ("[Federal courts'] review of evidentiary rulings is confined to 'determining whether the admission of evidence rendered the trial so fundamentally unfair as to violate due process.'") (citation omitted), *cert. denied*, 555 U.S. 871 (2008). Mere errors of state law do not warrant federal habeas relief. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). "Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Id.*

The Supreme Court has not held that the admission of irrelevant, prejudicial, or propensity evidence constitutes a constitutional due process violation. In fact, the Court has specifically left open these questions. *Estelle*, 502 U.S. at 70 ("[W]e need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial."); *id.* at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."). In *Estelle*, where the defendant was on trial for the murder of his infant daughter, the Court held there was no due process violation in the admission of evidence that the infant had sustained prior nonaccidental injuries, reasoning that the evidence was relevant to show the defendant's intent. *Id.* at 70. The Court's opinion cited to *Spencer v. Texas*, 385 U.S. 554 (1967) and *Lisenba v. California*, 314 U.S. 219 (1941). *Id.* at 70, 75. In

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

1   *Spencer*, the Supreme Court explained that the possible existence of less prejudicial ways to

2   introduce evidence of a prior conviction during a trial did not constitute a due process violation.

3   685 U.S. at 563.  In *Lisenba*, the Court held that inflammatory evidence—the presentation of live

4   rattlesnakes and testimony about them to show the defendant had used them to murder his wife—

5   did not "so infuse[] the trial with unfairness as to deny due process of law."  314 U.S. at 228.

6         The California Court of Appeal held that the admission of evidence of the prior burglary

7   and the hatchet did not violate Davis's due process rights because it was neither inflammatory nor

8   prejudicial, and therefore "did not 'infect[ ] the entire trial' or render it fundamentally unfair."

9   *Davis*, 2018 WL 2977267, at *11 n.10 (quoting *Estelle*, 502 U.S. at 72).  This Court agrees.  The

10  Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial

11  evidence constitutes a due process violation."  *Holley*, 568 F.3d at 1101.  Therefore, even

12  assuming, without deciding, that the evidence of the burglary or use of the hatchet was irrelevant[2]

13  or prejudicial, the "right [Davis] asserts has not been clearly established by the Supreme Court, as

14  required by AEDPA."  *Alberni v. McDaniel*, 458 F.3d 860, 867 (9th Cir. 2006).  And because the

15  Supreme Court has not clearly established that the admission of irrelevant or prejudicial evidence

16  is a due process violation, the California Court of Appeal's decision regarding the admission of

17  the burglary and hatchet evidence was not contrary to or an unreasonable application of clearly

18  established federal law, and habeas relief is not available based on the admission of the evidence.

19  *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to

20  the question presented, let alone one in [Petitioner's] favor, 'it cannot be said that the state court

21  "unreasonabl[y] appli[ed] clearly established Federal law.""") (citations omitted); *Holley*, 568 F.3d

22  at 1101 (finding Ninth Circuit was "without power to issue the writ" of habeas corpus "under the

23

24  [2] The burglary was in fact relevant to the prosecution's burglary special circumstance allegation because it was offered to show Davis's intent and motive to burglarize Martz's home.  6 RT 363.

25  Contrary to Davis's argument that intent and motive were not relevant because he did not mount a defense based on either issue, Pet. at 43, the prosecution must prove all elements of its case

26  beyond a reasonable doubt, and this burden "is not relieved by a defendant's tactical decision not to contest an essential element of the offense."  *Estelle*, 502 U.S. at 69.  "[N]othing in the Due

27  Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point."  *Id.* at 70.

28  Case No.: 19-cv-00444-EJD
    ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

United States District Court
Northern District of California

strict standards of AEDPA" based on admission of evidence claims).

Davis's reliance on *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993), is misplaced. *See, e.g.*, Pet. at 45, 53, 63. In *McKinney*, the Ninth Circuit held that the trial court's admission of "other acts" evidence—that the defendant, on trial for murdering his mother by cutting her throat, "enjoyed looking at, talking about, and possessing knives"—from which the jury could have drawn prejudicial propensity inferences rendered the trial fundamentally unfair. 993 F.2d at 1381–82, 1385–86. As a primary matter, as Respondent notes, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam). Additionally, the Ninth Circuit has since retreated from *McKinney*, holding that pre-AEDPA circuit cases like *McKinney* do not constitute federal law clearly establishing that due process protects the right to suppress prejudicial propensity evidence. *Alberni*, 458 F.3d at 864. The Court therefore finds *McKinney* inapposite.

## B.     Claim 3

Davis also argues that his due process rights were violated when the trial court improperly instructed the jury that it could use the burglary evidence, which included the testimony about the hatchet, to find not only that Davis had motive and intent to commit a burglary, but that he also committed the charged murder. Pet. at 66–72.

### 1.     Procedural Background

The trial court accepted defense counsel's proposed wording modifying CALCRIM jury instruction no. 375 to limit the jury's consideration of the burglary evidence to Davis's intent or motive to commit burglary. *Davis*, 2018 WL 2977267, at *12; *see* 14 RT 1532–33. The court refused the defense's other proposed modification to the instruction. *Id.* The prosecution requested the standard instruction. *Davis*, 2018 WL 2977267, at *12; 14 RT 1510. The jury received the following instruction:

> The People presented evidence that the defendant committed the offense of residential robbery against Mr. and Mrs. Fuchs in 1988 that was not charged in this case.
>
> You may consider this evidence only if the People have proved by a

United States District Court
Northern District of California

preponderance of the evidence that the defendant in fact committed the uncharged offense.  Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if it is more likely than not that the fact is true.

If the People have not met this burden, you must disregard this evidence entirely.

If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

The defendant acted with the intent to burglarize in this case; or

The defendant had a motive to commit a burglary in this case.

In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense.

Do not consider this evidence for any other purpose.

Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of murder or that the rape and/or burglary allegations have been proved.  The People must still prove each charge and allegation beyond a reasonable doubt.

*Davis*, 2018 WL 2977267, at *12; 15 RT 1560–61.

The state court held that any constitutional error in the instruction was harmless:

As with admissibility of evidence regarding the Fuchs incident itself, we need not definitively decide whether the court erred when it instructed the jury with modified CALCRIM No. 375.   That is because, even under the more stringent federal constitutional standard, we conclude any error on the part of the court in giving this instruction was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967)  386  U.S.  18,  24 (*Chapman* );  see *People v. Garceau* (1993) 6 Cal. 4th 140, 186 [assuming, without deciding, that *Chapman* standard of error was applicable to case involving erroneous instruction on use of prior offense evidence], disapproved on another ground in *People v. Yeoman* (2003) 31 Cal. 4th 93, 117–118.)

For the same reasons we found Fuchs's testimony itself harmless under the state standard of error (see *Watson*, *supra*, 46 Cal. 2d at [] 836), we conclude appellant was not prejudiced by any error in the court's instruction.  (See *Chapman*, *supra*, 386 U.S. at [] 24.)  First, as already discussed [], compelling evidence of appellant's guilt was

presented at trial.  (See *People v. Walker* (2006) 139 Cal. App. 4th 782, 810 [even under *Chapman* standard of error, instruction allowing jury to use prior offense evidence to prove defendant's predisposition to commit murder was harmless beyond a reasonable doubt, where physical evidence linked him to victim and none of witnesses who testified against him were self-interested].)  We also observe that regardless of the alleged error, the instruction expressly told the jury it could consider the prior offense evidence only to decide if appellant acted with the intent or motive to commit a burglary in this case and that it should not conclude from such evidence that appellant "has a bad character or is disposed to commit crime."  (Cf. *People v. Covarrubias, supra*, 1 Cal. 5th at p. 905.)  Finally, the prosecutor stated in closing argument that the Fuchs incident was relevant to whether appellant had entered Martz's home with the intent or motive to steal, and did not suggest the evidence was relevant to anything else.  (See *Middleton v. McNeil* (2004) 541 U.S. 433, 438 [court may assume that "counsel's arguments clarified an ambiguous jury charge," an assumption that "is particularly apt when it is the *prosecutor's* argument that resolves an ambiguity in favor of the *defendant*"].)

For these reasons, appellant has not shown that he was prejudiced by the court's failure to specify that the jury could consider the prior offense evidence only with respect to the burglary special circumstance allegation.  (See *Chapman, supra*, 386 U.S. at p. 24.)

*Davis*, 2018 WL 2977267, at *12–13.

### 2.   Legal Analysis

Where a state court determines a constitutional error is harmless, a federal court may not grant habeas relief unless the state court "applied harmless-error review in an 'objectively unreasonable' manner."  *Mitchell*, 540 U.S. at 18; *see also Inthavong v. Lamarque,* 420 F.3d 1055, 1058–59 (9th Cir. 2005) (Under AEDPA, federal courts "must defer to [the California Court of Appeal's harmless error] holding unless it was 'in conflict with the reasoning or the holdings of [Supreme Court] precedent' or if it 'applied harmless-error review in an "objectively unreasonable" manner.'") (citations omitted).  In evaluating the state court's application of harmless error review, federal courts "simply concern ourselves with the reasonableness of the evaluations and conclusions that the state court explicitly or implicitly made, although requiring the state court to meet the more stringent 'beyond a reasonable doubt' standard."  *Inthavong*, 420 F.3d at 1061.  If a federal court determines under AEDPA that the state court's harmless error holding is either contrary to Supreme Court precedent or objectively unreasonable, then the court

United States District Court
Northern District of California

1    conducts an independent harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619

2    (1993), without deference to the state court.  *Inthavong*, 420 F.3d at 1059.  A court may also

3    choose to conduct the *Brecht* analysis first, and then need only reach the AEDPA analysis if it

4    finds error under *Brecht*.  *Id.* at 1061.

5            The Supreme Court has held that a jury instruction may only give rise to habeas relief if

6    "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

7    process."  *Estelle*, 502 U.S. at 72 (citations omitted).  That an instruction was allegedly incorrect

8    under state law, including due to any deficiency in comparison to a model jury instruction, is not a

9    basis for habeas relief.  *Id.* at 71–72.  The challenged instruction must be considered in the context

10   of the instructions as a whole and the trial record, and an ambiguous instruction is evaluated for a

11   "reasonable likelihood that the jury [] applied the challenged instruction" in a way that violates the

12   constitution.  *Id.* at 72; *see also Jones v. United States*, 527 U.S. 373, 390 (1999).

13           Davis argues that the instruction to "consider the similarity or lack of similarity between

14   the uncharged offense and the charged offense" directed the jury to "use the prior uncharged

15   burglary as propensity evidence" and find that Davis's "bad character" made him more likely to

16   have committed the charged murder.  Pet. at 69–70.  But "[w]hen read in context … [t]his claim is

17   clearly foreclosed … by the language of the instruction."  *Estelle*, 502 U.S. at 73.  First,

18   immediately prior to the sentence contested by Davis, the trial court instructed the jury to consider

19   the evidence "for the limited purpose of deciding whether or not the defendant acted with the

20   intent to burglarize in this case or the defendant had a motive to commit a burglary in this case."

21   15 RT 1560–61.  Second, immediately after the contested sentence, the court instructed:  "Do not

22   consider this evidence for any other purpose.  Do not conclude from this evidence that the

23   defendant has a bad character or is disposed to commit crime."  *Id.*  Because the trial court

24   instructed the jury it could *not* use the evidence in the manner that Davis argues the instruction

25   permitted—*i.e.*, the court instructed the jury it could only use the burglary and hatchet evidence in

26   considering Davis's intent or motive to commit a burglary, and specifically could not use the

27   evidence to conclude that Davis had a bad character or a propensity to commit crime—the

28

United States District Court
Northern District of California

California Court of Appeal's decision was not contrary to Supreme Court precedent.  *See Estelle*, 502 U.S. at 75 (rejecting habeas claim based on instruction on prior conviction where instruction permitted only "the familiar use of evidence of prior acts for the purpose of showing intent, identity, motive, or plan," and prohibited use of evidence to "prove that [defendant was] a person of bad character or that he [had] a disposition to commit crimes").  Even if the contested sentence "was not as clear as it might have been," there is not a "reasonable likelihood" that the jury would have concluded it could use the burglary and hatchet evidence as propensity evidence.  *Id.* at 74.

Nor was the California Court of Appeal's harmless error analysis objectively unreasonable.  Davis argues that the burglary and hatchet evidence was so "vivid" and "inflammatory" that the court's allegedly erroneous instruction caused the "prior crime [to become] propensity evidence to commit great violence, and unfairly prejudiced the jury to identity Davis as Martz's killer."  Pet. at 71.  But in holding that any instructional error was "harmless beyond a reasonable doubt," the state appellate court found that "compelling evidence" of Davis's guilt was presented at trial, and noted both that the trial court provided an express limiting instruction and that the prosecutor did not suggest in closing argument that the burglary evidence was relevant to anything except Davis's intent or motive to burglarize Martz's home.  *Davis*, 2018 WL 2977267 at *12–13.  The "compelling evidence" included:  "DNA evidence [that] established with near certainty that [Davis's] semen, and no one else's, was inside Martz's vagina after her death"; Martz's underwear having been found near her body with no trace of semen on it (inconsistent with the theory that intercourse occurred 12 to 48 hours before her death); Davis's residence lying within 500 feet of Martz's home; and that Martz's missing purse and wallet were found in a maintenance area of the building where Davis lived and in which he had made forts in the past.  *Id.* at *10.  Even without the burglary and hatchet evidence, "an abundance of evidence attest[ed] to [Davis's] participation in [Martz's] murder."  *Inthavong*, 420 F.3d at 1062.  The California Court of Appeal was objectively reasonable to rule that any error in the instruction regarding the burglary and hatchet evidence was harmless beyond a reasonable doubt, so that habeas relief is unavailable based on the instruction.  *See id.*

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**C.     No Certificate of Accountability**

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c); Rule 11(a) of the Rules Governing Section 2254 Cases.  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is DENIED.

## IV.     CONCLUSION

For the reasons described above, neither the admission of the burglary evidence, including the testimony on the hatchet, nor the wording of the jury instruction regarding the burglary "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," as required for habeas relief under AEDPA.  28 U.S.C. § 2254(d).  Davis's petition for writ of habeas corpus is therefore **DENIED**.  Further, a certificate of appealability is **DENIED**.


**IT IS SO ORDERED.**

Dated: January 18, 2023


_____
EDWARD J. DAVILA
United States District Judge

Case No.: 19-cv-00444-EJD
ORDER DENYING PET. FOR WRIT OF HABEAS CORPUS
23